UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

FNA GROUP, INC.,

           Plaintiff,

   v.

JIANGSU LONGTENG-PENGDA
ELECTRICAL MECHANICAL CO., LTD.,

          Defendants.

Case No. 2:18-cv-00812-RFB-VCF

**ORDER**

## I.      INTRODUCTION

Before the Court is Plaintiff FNA Group, Inc.'s Motion for Default Judgment. ECF No. 39.

## II.      PROCEDURAL BACKGROUND

Plaintiff FNA Group, Inc., filed this action on May 7, 2018 alleging breach of non-disclosure agreement, breach of license contract, violation of the Nevada Deceptive Trade Practices statute, false designation of origin and false descriptions in violation of 15 U.S.C. § 1125, misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, patent infringement of U.S. Patent Nos. D700,211 and D699,762, tortious interference with prospective economic advantage, common law unjust enrichment, and common law unfair competition. ECF No. 1. Plaintiff sought, *inter alia*, an order preliminarily and permanently enjoining Defendant Jiangsu Longteng-Pengda Electric Mechanical Co., Ltd. ("LT") and all other persons or entities acting in concert with LT from using and disclosing FNA's confidential information, trade secrets, technology, and from infringing the U.S. Patent Nos. D699,762 and D700,211.

LT answered on June 28, 2018. ECF No. 14. Defendant's counsel moved to withdraw on November 21, 2018, ECF No. 26, and the motion was granted by Magistrate Judge Ferenbach on December 11, 2018, ECF No. 28. Magistrate Judge Ferenbach further ordered Defendant to retain counsel by January 11, 2019 or risk a recommendation of sanctions, including case-dispositive sanctions. Id. at 2. Magistrate Judge Ferenbach also ordered the parties to attend a status conference to be held on January 18, 2019. Id. at 2-3.

LT failed to appear at the status conference or to retain counsel and the Court adopted Magistrate Judge Ferenbach's Report and Recommendation recommending that LT's answer be stricken and default entered. ECF Nos. 32, 34. The Clerk of Court entered default against LT on February 12, 2019. ECF No. 37. On March 11, 2019, Plaintiff filed the instant Motion for Default Judgment. ECF No. 39. Defendant has not opposed the motion or otherwise appeared in this action since its counsel withdrew.

### III.    LEGAL STANDARD

The granting of a default judgment is a two-step process directed by Federal Rule of Civil Procedure ("Rule") 55. Eitel v. McCool, 782 F.2d 1470, 1471 (9th Cir. 1986). The first step is an entry of clerk's default based on a showing, by affidavit or otherwise, that the party against whom the judgment is sought "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). The second step is default judgment under Rule 55(b), a decision which lies within the discretion of the Court. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).

Factors which a court in its discretion may consider in deciding whether to grant a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of the substantive claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of a dispute of material fact, (6) whether the default was due to excusable neglect, and (7) the Federal Rules' strong policy in favor of deciding cases on the merits. Eitel, 782 F.2d at 1471–72.

If an entry of default is made, the Court accepts all well-pleaded factual allegations in the complaint as true; however, conclusions of law and allegations of fact that are not well-pleaded will not be deemed admitted by the defaulted party. DirecTV, Inc. v. Hoa Huynh, 503 F.3d 847,

854 (9th Cir. 2007). Additionally, the Court does not accept factual allegations relating to the amount of damages as true. <u>Geddes v. United Financial Group</u>, 559 F.2d 557, 560 (9th Cir. 1977). Default establishes a party's liability, but not the amount of damages claimed in the pleading. <u>Id.</u>

## IV.   DISCUSSION

Plaintiff moves for default judgment and seeks a permanent injunction against Defendant. The Court finds that the <u>Eitel</u> factors weigh in favor of granting the motion and issuing the injunction.

### A.  The Possibility of Prejudice to Plaintiff

Taking Plaintiff's well-pleaded factual allegations as true, the Court finds that the possibility of prejudice to Plaintiff is strong, as Plaintiff's allegations indicate LT is engaged in manufacturing and importing pumps based on Plaintiff's designs to Plaintiff's competitors, resulting in loss of customers, orders, and market share by Plaintiff. As LT has failed to make an appearance in this action in almost two years, without a default judgment in this action Plaintiff will continue to be harmed by Defendant.

### B.  Merits of the Claims

#### a.   Well-Pled Facts

The well-pled facts found by the Court follow.

Plaintiff is an Illinois corporation with its principal place of business in Wisconsin. Plaintiff develops, manufacturers and markets commercial and industrial pressure washers, pressure washer pumps, high pressure hoses, as well as accessories and replacement parts for those units. Defendant was a manufacturer for Plaintiff. In 2012, FNA entered into agreements with LT whereby FNA agreed to license certain technology and know-how information to LT for LT's manufacture and service of pumps and other related licensed products. The agreements between the Parties include: (1) a Nondisclosure, Noncompetition and Nonsolicitation Agreement (the "NDA") and (2) a Technology and Know-how License Contract (the "License Contract").

Plaintiff alleges the Parties entered into the NDA on March 27, 2012 in relation to the License Contract, in order to facilitate the licensing of FNA trade secrets and confidential information to LT for LT's manufacture of FNA Products. A breach of the NDA is governed by

3

Illinois law, as agreed to by the parties. The term of the NDA that applies to its Confidentiality provision ("Article 5") is ten years from the Effective Date of March 27, 2012. Pursuant to Article 5 of the NDA, LT "acknowledges and agrees that … [LT] has been given access and exposure to trade secrets and confidential information … regarding [FNA] or its Affiliates and their respective businesses, equipment, products and employees ("Confidential Information"), including but not limited to…" research, technology, intellectual property, technical information, methods, ideas, and "all other information [FNA] tries to keep confidential and that has commercial value or is of such a nature that its unauthorized disclosure would be detrimental to Licensor's interest."

Plaintiff alleges further that pursuant to Article 5(c), LT agreed:

> (i) to receive and keep all Confidential Information in confidence and not disclose any Confidential Information to any Person (including the Restricted Party or its Affiliates) …
> (ii) not to use or permit the use of any Confidential Information without first obtaining Licensor's written consent to such use …
> (iii) except as required by law or directed by Licensor, not [to] disclose or distribute or permit the disclosure or distribution of any Confidential Information, directly or indirectly, to any other Person (including any Restricted Party or any of its Affiliates); and
> (iv) to take or cause to be taken all other necessary and appropriate actions to preserve the confidentiality of the Confidential Information.

Plaintiff alleges LT breached Article 5 of the NDA by: (a) failing to keep Confidential Information in confidence; (b) using or permitting the use of Confidential Information without first obtaining FNA's written consent to do so; and (c) disclosing or distributing Confidential Information to third parties.

Plaintiff alleges that though LT is prohibited from using or permitting to be used by a third-party Plaintiff's confidential information, upon information and belief at the time the complaint was filed, LT was at the 2018 National Hardware Show that took place in Las Vegas, Nevada from May 8, 2018 to May 10, 2018. According to the show's website at the time the complaint was filed, LT was to be at booth 1011 and was offering its high-pressure washers, which included a pump. Plaintiff alleges most attendees at the Show plan to purchase and source new products when

4

they attend, thus, Plaintiff has been harmed, including by a loss of customers, orders, and market share, price erosion of its Products and patents, a loss of business opportunities, and a loss of goodwill and damage to its reputation.

Plaintiff further alleges that Article 6 of the NDA states:

> The Restricted Party acknowledges and agrees that any breach of the restrictive covenants set forth in Articles 3, 4 or 5 hereof will result in irreparable damage to Licensor … for which there will be no adequate remedy at law, and the Restricted Party consents to equitable relief … [and] other rights and remedies includ[ing], without limitations, monetary damages and payment of all costs incurred by the Company in enforcement against the Restricted Party of any provision of this Agreement at law or in equity, including reasonable attorneys' fees.

On the same day the NDA was executed, the parties also entered into the License Contract so that FNA could grant to LT a nonexclusive, non-transferable, non-sublicensable and royalty license to use FNA's technology and know-how "solely for (a) manufacturing Licensed Products in the Territory and for (b) providing after-sale and other ancillary services in relation to any Licensed Product." A breach of the License Contract is governed by Illinois law, as agreed to by the parties.

The License Contract incorporates the NDA. Article 1.7 of the License Contract defined "Technology and Know-How" as:

> (a) with respect to "Technology", the proprietary technology (whether or not patented, including formula, method, process, technique, invention and industrial design) in relation to the manufacture, assembly, use, sale, marketing or other disposition of any Licensed Product, and (b) with respect to "Know-how", technical knowledge, experience, skills, commercial secrets, special techniques (including product quality control) and proprietary information in relation to the manufacture, assembly, use, sale, marketing or other disposition of any Licensed Product, and (c) all Technical Improvements thereto; in each case, which will be provided or furnished from time to time by or on behalf of the Licensor to the Licensee or any of its Affiliates or any Guarantor pursuant to this Contract or which has been provided or furnished to the Licensee and/or any of its Affiliate or any Guarantor prior to the date hereof.

The License Contract was terminated when the business relationship ended, but Section 9.3 states that in the event of termination, the Licensee (LT) covenants that it:

> (a) shall not sell, transfer, license, dispose of, or otherwise provide all or any part of the Technology and Know-how to any third Person (or any Affiliate of Licensee), in any manner whatsoever;
> (b) shall immediately cease, or cause to be [ceased], the manufacture of the Licensed Products and stop using the Technology and Know-how;
> (c) shall cease (or cause to be ceased) the using or disclosing any Confidential Information; and
> (d) shall immediately return (or caused to be returned) to Licensor all tangible forms of the Confidential Information and the Technology and Know-how (including, without limitation, the Technical Documentation), whether in written or other form, and all copies thereof.

Plaintiff alleges LT breached Section 9.3 of the License Agreement by: (a) selling, transferring, licensing, disposing of, or otherwise providing parts of FNA's Technology and Know-how to third persons; (b) continuing to manufacture and use the Licensed Products and FNA's Technology and Know-how; (c) continuing to use or disclose Confidential Information; and (d) not returning or causing to be returned to FNA all tangible forms of the Confidential Information and Technology Know-how provided to LT in written or other form.

Upon execution of, and reliance on the NDA and License Contract, FNA provided various items of confidential information, know-how and trade secrets to LT. The professional relationship ended in 2016.

Plaintiff alleges that during the time Defendant manufactured Plaintiff's products, LT obtained a number of Chinese patents regarding FNA's Products, which Plaintiff was unaware of and in violation of the License Contract. In 2017, LT filed a lawsuit in China against FNA's new Chinese manufacturer, Suzhou DanNio for patent infringement based upon one of those improperly obtained patents. After FNA notified LT that the patent filings were improper under the parties' agreements, LT withdrew the Chinese patents regarding FNA technology thereby abandoning any rights and dropped the lawsuit.

Plaintiff alleges on information and belief that LT has recently been manufacturing Products based on FNA's confidential information, know-how and trade secrets and selling and shipping them to companies based in the United States. This alleged conduct violates the parties' agreements as well as federal and Illinois state law. Plaintiff further alleges upon information and belief that LT has been utilizing FNA trade secrets, know-how and confidential information to manufacture, offer to sell, and sell Products virtually identical to FNA's directly to third parties.

Specifically, LT was offering products on its website that it previously manufactured for FNA under the agreements, including LT's product LT901/LT902 (vertical axial pump), which is actually FNA's pump model number 510001, LT's product LT921/LT922 (horizontal axial pump), which is actually FNA's pump model number 520002, LT's product LT931/LT932 (forged brass pump head), which is actually FNA's pump model number 530008, and LT's product LT951/LT952 (forged brass pump head), which is actually FNA's pump model 530006. Plaintiff alleges it provided the confidential engineering drawings and specifications for these pumps during their parties' business relationship and that it has patent protection on the ornamental design of the 510001 pump including U.S. Patent No. D691,638, the ornamental design of the 520002 pump including U.S. Patent No. D699,762, the ornamental design of the 530008 pump including U.S. Patent Nos. D670,312 and D700,211, and the ornamental design of the 530006 pump including U.S. Patent No. D692,026.

Plaintiff alleges upon information and belief that LT has used FNA's trade secrets and confidential information to manufacture axial pumps virtually identical to those of FNA for FNA's direct competitors, including at least Karcher North America and Nilfisk Pressure Pro, Inc., based on similarities between the pumps sold by these competitors and those pumps protected by Plaintiff's patents. Plaintiff alleges upon information and belief that Defendant manufactures and imports its pumps for Karcher and Nilfisk in violation of the parties' agreements.

Specifically, Plaintiff alleges upon information and belief that LT manufacturers and imports into the United States pumps for Nilfisk Pressure Pro's Dirt Laser pressure washers. These pressure washers are offered for sale on Power Equipment Direct's website. Plaintiff alleges upon information and belief that Nilfisk Pressure Pro's Dirt Laser model PP3425H incorporates a knock-

off of FNA's pump 530008, and Plaintiff includes pictures of the two models to permit a comparison of their similarities. FNA states that it provided the confidential engineering drawings and specifications for this pump during the Parties' relationship. FNA has patent protection on the ornamental design of the 530008 pump including U.S. Patent No. D700,211.

Plaintiff also alleges upon information and belief that Nilfisk Pressure Pro's Dirt Laser models PP3225H and PP3225K also incorporate a knock-off of FNA's patented pump 520002, also illustrated in the complaint. Plaintiff states upon information and belief that LT manufactures the LT921/LT922 (horizontal axial pump) and imports those pumps into the United States to Karcher North America. Plaintiff also states upon information and belief that LT manufactures the LT921/LT922 (horizontal axial pump) and imports the pump into the United States to Nilfisk Pressure Pro LLC through agent companies authorized to act on LT's behalf.

Plaintiff's patent for the 520002 "Pump" was issued on February 18, 2014, as United States Patent No. D699,762 ("the '762 patent") while Plaintiff's patent for the 530008 "Pump" issued on October 22, 2013[1], as United States Patent No. D700,211 ("the '211 patent"). Plaintiff attaches a copy of both patents to the complaint. Plaintiff alleges LT has been aware of the applications that resulted in the '762 and '211 patents since their filing, as one of the listed inventors of both patents is an employee of LT.

### b.  Breach of Non-Disclosure Agreement

Plaintiff alleges breach of the NDA, which is governed by Illinois law. "[P]arties are permitted within broad limits to choose the law that will determine the validity and effect of their contract." Ferdie Sievers & Lake Tahoe Land Co. v. Diversified Mortg. Inv'rs, 603 P.2d 270, 273 (Nev. 1979). Under Illinois law, "The essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resultant injury to the plaintiff." Pepper Const. Co. v. Palmolive Tower Condominiums, LLC, 2016 IL App (1st) 142754, ¶ 85, 59 N.E.3d 41, 66. See also Smith v. Jones,

---

[1] The complaint indicates the '211 patent issued on this date; however, Exhibit 5 attached to the complaint indicates it issued on February 25, 2014. See ECF No. 1-6 at 2. The difference is immaterial to the Court's analysis of this motion.

1  497 N.E.2d 738, 740 (Ill. 1986) (citing the elements of a breach-of-contract cause of action as

2  offer, acceptance, consideration and failure to perform).

3      Accepting Plaintiff's well-pled facts as true, Plaintiff has established the existence of a

4  valid and enforceable contract in the form of the NDA, which was attached to the complaint, that

5  Plaintiff performed by providing LT confidential information pursuant to the License Contract,

6  and LT breached the NDA's confidentiality provisions by manufacturing, selling, and shipping

7  products based on the information Plaintiff provided in violation of its duty to not to use or permit

8  to be used any confidential information without prior authorization and not otherwise disclose the

9  confidential information. Plaintiff has also alleged injury in the form of loss of customers, orders,

10  and market share; price erosion of its Products and patents; a loss of business opportunities; and a

11  loss of goodwill and damage to its reputation.

12      Therefore, the Court finds that the well-pled facts establish breach of the NDA, providing

13  grounds for default judgment on this claim.

14          c.   *Breach of the Technology and Know-How License Agreement*

15      Plaintiff alleges LT breached the License Contract, which is also governed by Illinois law.

16  Accepting Plaintiff's well-pled facts as true, Plaintiff has established the existence of a valid and

17  enforceable contract in the form of the License Contract, which is attached to the complaint, that

18  Plaintiff performed pursuant to the contract, and that Defendant breached Article 9.3 of the License

19  Contract, which prohibited Defendant from using the confidential information or providing it to

20  third parties, by manufacturing, selling, and shipping products based on that confidential

21  information. Plaintiff has also alleged injury, as cited *supra*.

22      Therefore, the Court finds that the well-pled facts establish breach of the License

23  Agreement, providing grounds for default judgment on this claim.

24          d.   *Violation of the Nevada Deceptive Trade Practices, NRS 598.0915 and False*

25              *Designation of Origin and False Descriptions, 15 U.S.C. § 1125*

26      Plaintiff alleges both violations of Section 43(a) of the Lanham Act and the Nevada

27  Deceptive Trade Practices Act ("NDTPA") based on LT "passing off" Plaintiff's products as its

28  / / /

9

own. Given the similarity between these two claims, the Court considers them together, starting with the Lanham Act.

Plaintiff alleges false designation of origin and false descriptions under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 1125(a)(1)(A) states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

"The Lanham Act prohibits conduct that would confuse consumers as to the origin, sponsorship, or approval of goods or services." OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc., 897 F.3d 1008, 1013 (9th Cir. 2018) (citing cases). In addition to trademark protection, the Lanham Act protects a product's "trade dress," which includes its design. Id. (citing TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 28 (2001); Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209 (2000)). "The term 'origin' in section 43(a) lends itself to two causes of action for 'passing off' based on false designation of origin: passing off and reverse passing off." OTR, 897 F.3d at 1016 (quoting Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 27 n.1 (2003)). "'Passing off ... occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own.'" Id. In Dastar Corp. v. Twentieth Century Fox Film Corp., the Supreme Court held that a claim for reverse passing off cannot be

10

brought to prevent the copying of intellectual property. 539 U.S. at 37. "Copying is dealt with through the copyright and patent laws, not through trademark law." OTR, 897 F.3d at 1016 (citing Dastar Corp., 539 U.S. at 33-34).

The Court finds that Plaintiff's well-pled facts do not state a cognizable claim under 15 U.S.C. § 1125(a) for false designation of origin and false description. Taking Plaintiff's well-pled facts as true, Plaintiff has alleged a "reverse passing off" claim, asserting that Defendant misused Plaintiff's confidential information by, essentially, copying it to manufacture, ship, and sell pumps of its own based on Plaintiff's technology and know-how. Therefore, the "origin" of the offending goods (pumps) is LT, not Plaintiff, and as such, Plaintiff cannot make a prima facie case against LT under this claim. See Dastar Corp., 539 U.S. at 34 (quoting TrafFix, 532 U.S. at 29) ("'The Lanham Act,'" we have said, 'does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity.'"); Kehoe Component Sales Inc. v. Best Lighting Prod., Inc., 796 F.3d 576, 587 (6th Cir. 2015) (citing Dastar, 539 U.S. at 29, 31) ("As Dastar makes plain, an entity makes a false designation of origin sufficient to support a reverse passing off claim only where it falsely represents the product's geographic origin or represents that it has manufactured the tangible product that is sold in the marketplace when it did not in fact do so."). Plaintiff's false description claim fails for the same reason—to the extent Plaintiff alleges LT has engaged in "false or misleading descriptions of fact" because it failed to convey to buyers that its pumps were based on Plaintiff's patents and confidential information, the Lanham Act does not extend to claims of that kind. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1144 (9th Cir. 2008) (holding that the reasoning in Dastar limits the inquiry as to a claim of misrepresentation in advertising or promotion under the Lanham Act to misrepresentation about the characteristics of the good itself).

Turning to Plaintiff's claim under the NDTPA, Plaintiff alleges LT engaged in deceptive trade practices under NRS 598.0915, which enumerates a number of different deceptive trade practices. See NRS § 598.0915. Plaintiff's allegations as to "passing off" under the NDTPA claim are verbatim those made as to the Lanham Act claim, but Plaintiff specifically asserts that LT

///

11

1   violated NRS 589.0915 by deceiving the public and causing confusion and mistake as to the proper

2   origin of LT's products.

3          Accepting Plaintiff's well-pled facts as true, the Court finds that Plaintiff has failed to

4   establish a violation of the NDTPA for much the same reasons as it has failed to establish a

5   violation of the Lanham Act—namely, the statute does not cover the conduct alleged. Under the

6   NDTPA, "[a]n action may be brought by any person who is a victim of consumer fraud." Nev.

7   Rev. Stat. § 41.600(1). "Consumer fraud" includes deceptive trade practices as defined by NRS

8   598.0915 to 598.0925, inclusive. NRS 41.600(2)(e). A claim under the NDTPA "requires a 'victim

9   of consumer fraud to prove that (1) an act of consumer fraud by the defendant (2) caused (3)

10  damage to the plaintiff.'" Sattari v. Wash. Mut., 475 Fed. Appx. 648, 648 (9th Cir. 2011) (quoting

11  Picus v. Wal-Mart Stores, Inc., 256 F.R.D. 651, 658 (D. Nev. 2009) ). NRS 598.0915(4) identifies

12  as a deceptive trade practice the use of  "deceptive representations or designations of geographic

13  origin in connection with goods or services for sale or lease." Plaintiff has not alleged that

14  Defendant has made deceptive representations or designations as to the *geographic* origin of its

15  products, but as to their origin in the sense that they are derived from Plaintiff's patented pumps

16  and confidential information. The statute does not encompass "origin" in this sense.

17         Therefore, the Court finds that Plaintiff's well-pled facts do not support claims under the

18  NDTPA or Lanham Act, and these claims do not therefore serve as grounds for default judgment.

19             *e.  Misappropriation of Trade Secrets in Violation of the Defend Trade*

20                  *Secrets Act, 18 U.S.C. § 1836, et seq.*

21         Plaintiff alleges violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, based on

22  LT's alleged misappropriation of Plaintiff's trade secrets. The Defend Trade Secrets Act provides

23  that, "An owner of a trade secret that is misappropriated may bring a civil action under this

24  subsection if the trade secret is related to a product or service used in, or intended for use in,

25  interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The statute applies to conduct outside

26  the United States if, *inter alia*, "an act in furtherance of the offense was committed in the United

27  States." Id. at § 1837(2). The statute affords courts the power to grant an injunction. Id. at §

28  1836(3)(A).

The statute defines "trade secret" as:

[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C.A. § 1839 (2016). The statute defines "misappropriation" as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

> (i) used improper means to acquire knowledge of the trade secret;

> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

>> (I) derived from or through a person who had used improper means to acquire the trade secret;

>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

> (iii) before a material change of the position of the person, knew or had reason to know that—

13

(I)     the trade secret was a trade secret; and

(II)    knowledge of the trade secret had been acquired by accident or mistake;

Id. at § 1839(A)-(B).

Accepting Plaintiff's well-pled facts as true, Plaintiff has established a violation of the Defend Trade Secrets Act. Plaintiff is an "owner" of its trade secrets as the "entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." Id. at § 1839(4). Plaintiff provided to LT information related to its products and services, including, formulas, designs, drawings, pricing and costing, marketing plans, sketches, models, product configurations, design or performance specifications and proprietary information relating to the manufacture, assembly, use, sale, consumer feedback, and market research. This information constitutes trade secrets as contemplated by the Act. Further, the well-pled facts indicate that Plaintiff strived to keep this information secret, as evidenced in part by the NDA attached to the complaint, and the information derives independent economic value from not being generally known. Further, LT misappropriated Plaintiff's trade secrets by using those trade secrets to manufacture, ship, and sell its own pumps without Plaintiff's consent despite knowing or having reason to know that the secrets were acquired pursuant to the NDA and License Contract which imposed a duty on LT to maintain their secrecy.

Therefore, the Court finds that the well-pled facts establish a violation of the Defendant Trade Secrets Act, providing grounds for default judgment on this claim.

*f.*   *Patent Infringement, U.S. Patent Nos. D699,762, D700,211*

Plaintiff alleges that Defendant has manufactured and sold pumps or pressure washers that directly or indirectly infringe, either literally or under the doctrine of equivalents, on Plaintiff's '762 and '211 patents in violation of 35 U.S.C. § 271. Specifically, Plaintiff alleges design patent infringement. In order to evaluate design patent infringement, courts employ the "ordinary observer test," which asks whether "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." Richardson

1    v. Stanley Works, Inc., 597 F.3d 1288, 1295 (Fed. Cir. 2010) (citation omitted). Equitable relief is

2    available for patent infringement, "in accordance with the principles of equity." 35 U.S.C. § 283.

3        Accepting Plaintiff's well-pled facts as true, the Court finds that Plaintiff has established

4    design patent infringement of both its '726 and '211 patents. Plaintiff attaches its patents to the

5    complaint to demonstrate its ownership of the patents as well as visual comparisons between its

6    patents and LT's pumps. Further, Plaintiff has alleged LT manufactured, shipped, and sold its

7    pumps into the United States.

8        Therefore, the Court finds that the well-pled facts establish design patent infringement,

9    providing grounds for default judgment on these claims.

10                    *g.  Tortious Interference with Prospective Economic Advantage*

11       Plaintiff alleges tortious interference with prospective economic advantage, asserting it had

12   a reasonable expectation to enter into valid business relationships with Karcher, Nilfisk, and any

13   other companies in need of its products. In order to establish wrongful interference with

14   prospective economic advantage, a Plaintiff must demonstrate:

15
                (1) a prospective contractual relationship between the plaintiff and a third party; (2)
16              knowledge by the defendant of the prospective relationship; (3) intent to harm the
                plaintiff by preventing the relationship; (4) the absence of privilege or justification
17              by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's
                conduct.
18

19   In re Amerco Derivative Litig., 252 P.3d 681, 702 (Nev. 2011) (quoting Wichinsky v. Mosa, 847

20   P.2d 727, 729–30 (Nev. 1993)).

21       Accepting Plaintiff's well-pled facts as true, the Court does not find that Plaintiff has

22   established wrongful interference with prospective economic advantage, as Plaintiff has not pled

23   facts to support that it had prospective contractual relationships with Karcher, Nilfisk, or any other

24   entity, though Plaintiff alleges it had a reasonable *expectancy* of having such relationships.

25   Accordingly, the Court does not find that this claim provides grounds for default judgment.

26                            *h.  Common Law Unjust Enrichment*

27       Plaintiff also asserts a common law unjust enrichment claim against Defendant for

28   diverting sales that otherwise would have gone to Plaintiff by misappropriating Plaintiff's trade

                                            15

secrets and infringing Plaintiff's patents. The elements of unjust enrichment are: (1) "the plaintiff confers a benefit on the defendant," (2) "the defendant appreciates such benefit," and (3) there is "acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." Certified Fire Prot. Inc. v. Precision Constr., 283 P.3d 250, 257 (Nev. 2012) (citation omitted). Yet, where there is an express contract, a claim for unjust enrichment is unavailable. Leasepartners Corp. v. Robert L. Brooks Tr. Dated Nov. 12, 1975, 942 P.2d 182, 187 (Nev. 1997) ("An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement.").

Accepting Plaintiff's well-pled facts as true, the Court finds that Plaintiff cannot establish a claim for unjust enrichment as the facts and exhibits indicate the existence of a valid, express contract between the parties. Therefore, the Court does not find that this claim provides grounds for default judgment.

### i. Common Law Unfair Competition

The Ninth Circuit "has consistently held that state common law claims of unfair competition are . . . 'substantially congruent' to claims made under the Lanham Act." Cleary v. News Corp., 30 F.3d 1255, 1262–63 (9th Cir. 1994). Similarly, the Supreme Court in Dastar noted in dicta that the "overall law of unfair competition" is broader than those specific instances of unfair trade practices prohibited by the Lanham Act. 539 U.S. at 29 (citing 4 J. McCarthy, Trademarks and Unfair Competition § 27:7, p. 27–14 (4th ed. 2002)). The tort of unfair competition is highly flexible and gives courts the equitable power "to create remedies in new situations, whether the judge labels the law applied as 'unfair competition' or some other tort." 1 McCarthy on Trademarks and Unfair Competition § 1:16 (5th ed. 2020).

Accepting Plaintiff's well-pled facts as true, the Court finds that Plaintiff has established that Defendant engaged in unfair competition causing harm to Plaintiff. The misappropriation of Plaintiff's trade secrets and patent infringement led to Defendant's contracts for its offending pumps and pressure washers with Karcher and Nilfisk. Accordingly, the Court finds these well-pled facts provide grounds for default judgment as to this claim.

16

1

*j.  Permanent Injunction*

2       As noted *supra*, the Defend Trade Secrets Act create the possibility of injunctive relief,

3   granting courts the power to issue an injunction "to prevent any actual or threatened

4   misappropriation . . . on such terms as the court deems reasonable," subject to some limitations

5   not applicable here. 18 U.S.C. § 1836(A)(i). Additionally, the statute governing patents also allows

6   for equitable relief. 35 U.S.C.A. § 283. Furthermore, the NDA also indicates that equitable relief

7   is warranted if its terms are breached. Despite this statutory and contractual availability, Plaintiff's

8   claim must nonetheless satisfy the equitable requirements for a permanent injunction. See eBay,

9   Inc. v. MercExchange, LLC, 547 U.S. 388, 394 (2006) (requiring application of "traditional four-

10  factor framework that governs the award of injunctive relief" to a copyright infringement claim);

11  Herb Reed Enterprises, LLC v. Florida Entertainment Management Inc., 736 F.3d 1239, 1249 (9th

12  Cir. 2013) ("Following eBay ... we held ... that actual irreparable harm must be demonstrated to

13  obtain a permanent injunction in a trademark infringement action."). "According to well-

14  established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-

15  factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered

16  an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

17  to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

18  and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

19  disserved by a permanent injunction." eBay, 547 U.S. at 391.

20      Plaintiff has established irreparable injury, as "[e]vidence of threatened loss of prospective

21  customers or goodwill certainly supports a finding of the possibility of irreparable harm."

22  Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001).

23  Plaintiff has indicated that Defendant's conduct is ongoing, that the market for its products is

24  competitive, and Plaintiff is able to distinguish itself in this competitive market through its product

25  innovation. Plaintiff will likely lose additional prospective customers if an injunction does not

26  issue. Similarly, a loss of customers is an intangible harm not adequately compensable through

27  monetary damages, a fact acknowledged by Defendant when it signed the NDA stating as much.

28

1    Furthermore, the well-pled facts accepted as true indicate a balance of the hardships favors

2    Plaintiff, as it will continue to suffer irreparable harm if an injunction does not issue.

3    Finally, as the Deceptive Trade Practices Act and the statute governing remedies for patent

4    infringements explicitly allow for equitable relief, the Court finds that the public interest will be

5    vindicated by an injunction that prevents Defendant from ongoing violation of the statutes, as well

6    as conduct that harms competition.

7    The Court therefore finds that Plaintiff has met the statutory and equitable requirements

8    for injunctive relief.

9

10    **C.  The Sufficiency of the Complaint**

11    The Court incorporates its discussion *supra* of the merits of the substantive claims asserted

12    in the complaint and finds that the complaint is sufficient to warrant the equitable relief requested.

13    As such, this factor favors default judgment.

14

15    **D.  The Sum of Money at Stake**

16    Though Plaintiff sought damages in addition to equitable relief in its complaint, the primary

17    focus of the instant motion is the pursuit of a permanent injunction. Indeed, Plaintiff makes no

18    attempt to calculate the damages alleged and attaches a proposed order to the instant motion that

19    awards only equitable relief. As default establishes a party's liability but not the amount of damages

20    claimed in the pleading, and as no specific amount of damages was identified in the complaint, the

21    Court will limit relief to a permanent injunction.

22

23    **E.  The Possibility of a Dispute Concerning the Merits**

24    As Defendant has not appeared in this action since 2018 and failed to appear at Magistrate

25    Judge Ferenbach's status conference or otherwise respond to this motion, the Court finds that the

26    possibility of a dispute of material fact is therefore highly unlikely.

27

28

**F.  Whether Default was Due to Excusable Neglect**

The Court similarly finds that it is highly unlikely that after over a year and a half of silence, Defendant could convincingly claim excusable neglect, particularly as Defendant previously appeared in this action with counsel.

**G.  The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits**

Defendant's failure to appear in this action essentially precludes a decision on the merits. This factor does not therefore weigh against awarding default judgment.

**V.      CONCLUSION**

Therefore, the Court finds that on balance, the <u>Eitel</u> factors support an order granting default judgment, and permanent injunctive relief pursuant to that order.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Default Judgment (ECF No. 39) is GRANTED.  The Clerk of Court is instructed to enter judgment in favor of Plaintiff and against Defendant Jiangsu Longteng-Pengda Electric Mechanical Co., Ltd.

**IT IS FURTHER ORDERED** that Defendant Jiangsu Longteng-Pengda Electric Mechanical Co., Ltd. including any of its agents, officers, employees, representatives, successors, assigns, affiliates, licensees, distributors, and all persons and companies in privity or active concert or participation with Defendant, and all persons acting under their permission and authority are permanently enjoined from:

A.  directly or indirectly using, for any purpose, FNA's confidential information, know-how, and trade secrets (collectively, "FNA Materials and Information").

B.  directly or indirectly disclosing, for any purpose, any of FNA Materials and Information to any third party, including but not limited to any current, future, actual or potential competitor or customer of FNA;

C.  directly or indirectly selling, offering for sale, conveying, transferring, developing, designing, manufacturing or otherwise commercializing or profiting from FNA Materials and Information;

D.  directly or indirectly using, disclosing or accessing any information, including any FNA Materials and Information, in any manner inconsistent with or in breach of the NDA or License Contract;

E.  directly or indirectly using, disclosing or accessing any information in any manner that violates any intellectual property rights of FNA, violates any state or federal law governing use, disclosure or access of any FNA Materials or Information, or otherwise violates any right or privilege of FNA;

F.  directly or indirectly infringing U.S. Patent Nos. D699,762 and D700,211.

**IT IS FURTHER ORDERED** that within fourteen (14) days of entry of this Order, Defendant shall return and transfer to FNA all FNA Materials and Information. This Court shall retain jurisdiction over any and all issues arising from or related to the enforcement of this Permanent Injunction, the implementation of this Order or the interpretation of this Order.

**DATED**: May 31, 2020.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

20